UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                    )
PAUL N. NELSON,                     )
                                    )   No. C07-1660RSL
                Plaintiff,          )
        v.                          )
                                    )   ORDER GRANTING DEFENDANTS'
K2 INC. and K-2 CORPORATION,        )   MOTION FOR SUMMARY
                                    )   JUDGMENT UNDER 35 U.S.C. § 102(b)
                Defendants.         )
_____ )

This matter comes before the Court on "K2's Motion for Summary Judgment." Dkt. # 52. Defendants argue that United States Patent No. 5,603,522 (the '522 patent) is invalid because plaintiff sold skis made in accordance with its claims more than a year before the effective filing date of the patent application. Plaintiff asserts that his sales were primarily for purposes of experimentation and therefore are not evidence that the invention was "on-sale" before September 23, 1993.[1]

On October 15, 2008, the Court determined that the claims of the '522 patent were entitled to the benefit of a September 23, 1994, application filing date. Dkt. # 50. An inventor is

---

[1] Defendants argue that another manufacturer also sold skis within the scope of all three claims of the '522 patent. Because plaintiff's sales trigger the § 102(b) bar, the Court need not determine whether defendants have shown by clear and convincing evidence that the RD Fat Dog embodied every limitation of the claims of the '522 patent.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

not entitled to a patent, however, if the invention was on sale more than one year prior to the date of the patent application. 35 U.S.C. § 102(b). The "on-sale" bar applies if the invention (i) was the subject of a commercial sale or offer of sale and (ii) was ready for patenting, meaning that the invention had been reduced to practice or was the subject of drawings or other descriptions that would enable a person skilled in the art to practice the invention. Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67 (1998). Plaintiff challenges both prongs of the Pfaff test.

**A. Commercial Sale or Offer of Sale**

Although an inventor is generally barred from removing existing knowledge from public use, he "may conduct extensive testing without losing his right to obtain a patent for his invention – even if such testing occurs in the public eye." Pfaff, 525 U.S. at 64. Thus, the on-sale bar is triggered only by commercial sales of the invention. When determining whether a particular sale was for commercial or experimental purposes, the Court should consider a variety of factors, including:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, . . . (9) the degree of commercial exploitation during testing[,] . . . (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

EZ Dock v. Schafer Sys., Inc., 276 F.3d 1347, 1357 (Fed. Cir. 2002) (Linn, J., concurring). The focus of the inquiry is not whether the invention was still under development or subject to improvement at the time of an asserted sale. Instead, the issue is whether the primary purpose of each transaction was to conduct experimentation. See Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1354 (Fed. Cir. 2002) (citations omitted).

The Court recognizes that plaintiff is an individual, not a large corporation, and

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT                -2-

takes his comparative resources into consideration when evaluating the primary purpose of the 1992-93 transactions.  In particular, the Court assumes that full-scale experimentation would likely be beyond plaintiff's means and that there would be a greater-than-normal need to obtain timely financial remuneration from his invention.  Lough v. Brunswick Corp., 86 F.3d 1113, 1121 (Fed. Cir. 1996).  Nevertheless, the basic elements of an experimental program must be present to avoid the public use bar: "[t]he law does not waive statutory requirements for inventors of lesser sophistication." Id. at 1122.

Defendants, as the parties asserting patent invalidity, have the burden of proving by clear and convincing evidence that the patent was in public use before September 23, 1993. Defendants have submitted evidence of, and plaintiff has acknowledged, sales of the patented skis under the name MAX F/X before September 23, 1993.  Once a *prima facie* case of public use has been made, the patentee must come forward with "'convincing evidence' of experimental use to counter that showing." Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 306, 1316 (Fed. Cir. 2005) (quoting TP Labs., Inc. v. Professional Positioners, Inc., 724 F.2d 965, 971 (Fed. Cir. 1984)). Plaintiff argues that all of the pre-September 23, 1993, sales fall within the experimental use exception to the on-sale bar because (a) public testing and evaluation under real world conditions was necessary, (b) a survey was included with each pair of skis, (c) plaintiff actively sought feedback from a number of purchasers, and (d) design revisions were made based on user feedback.

"[A] single sale or offer of sale suffices to bar patentability." Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co., 417 F.3d 1203, 1209 (Fed. Cir. 2005). Because the Court must conduct an "objective evaluation of the facts surrounding the transaction" in order to determine whether the primary purpose of the inventor was to conduct experimentation, the details of two transactions will be evaluated in the larger context of

plaintiff's activities during the 1992-93 ski season. Id. at 1210.[2] The first transaction involves a consignment and sale with Sportsman, a shop in Bellingham, Washington. According to the evidence provided, plaintiff's wife, Coni Nelson, began contacting Sportsman in September 1992 to see if they were interested in carrying the MAX F/X skis. Decl. of Coni Nelson, Ex. B. The shop agreed to take a pair of skis on consignment. They were delivered to Sportsman in October, along with a copy of plaintiff's user survey. The terms of the consignment were as follows: "If no interest has been generated in this ski and the ski has not been sold ODYSSEY SKIS can request ski to be returned or consignment amount of $380.00 after 60 days. To be evaluated 12/7/92." Motion at Ex. 4. On or about December 30, 1992, Ms. Nelson's notes indicate that "someone called to ask where to mount bindings cause ODYSSEY sold." Ms. Nelson sent an acknowledgment of sale and received payment for the skis.

The second transaction is reflected in an invoice to Richard W. Smith, dated November 22, 1992. Motion at Ex. 6. Mr. Smith apparently purchased a pair of MAX F/X skis at retail for $332.50. They were shipped to him in East Hampton, New York, and the balance was paid by check within the month. Other than a notation on the invoice that the "binding paper jig" could be found in the "brake wire package," there are no terms or conditions associated with this sale.[3] The Court is willing to assume, based on Coni Nelson's declaration, that the skis were shipped with a copy of the user survey. Decl. of Coni Nelson at ¶ 5.

Plaintiff and his wife assert, without even attempting to address each sale

---

[2] The transactions, one from Coni Nelson's sales notes and one from the invoices attached to defendants' motion, were not chosen for any particular reason. The Court suspects that a similar analysis could be made with regards to most of the transactions revealed by the record.

[3] What appears to be an extraneous note is included on Mr. Smith's invoice. A post-it (or at least a small rectangular paper) was placed on the invoice before photocopying. The post-it originally said "45 skis sold" with the "5" overwritten by a darker "7." Based on representations and explanations presented during oral argument, the Court assumes that the total number of skis sold during the 1992-93 ski season was 47 pairs.

individually, that all of the transactions during this period were part of a "testing and evaluation" program. Decl. of Paul Nelson at ¶ 5; Decl. of Coni Nelson at ¶ 4. The contemporaneous evidence does not support these statements, and "the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value." Lough, 86 F.3d at 1122. A series of newspaper articles written between December 1992 and February 1993 shows that plaintiff was actively marketing the MAX F/X for consumer use during the 1992-93 ski season.[4] According to the articles, plaintiff received orders from eight Western Washington stores, was taking orders from individual skiers, and was working toward manufacturing twenty pairs of skis per week. In the December 30, 1992, article, readers were invited to order their own pair of MAX F/X skis by calling the phone number provided. There is no indication that plaintiff was seeking "testers" for the skis or was conducting experiments before making his invention available to the public. Rather, his statements to the reporters and the existence of the articles themselves show a concerted effort to bring the invention to market immediately. Ms. Nelson's sales notes support this conclusion. They show that plaintiff was trying to convince a number of ski shops around the country to carry the MAX F/X. If an outright sale was not in the offing, plaintiff would agree to a consignment, demonstration, or loan

---

[4] Although plaintiff submitted these articles with its opposition and defendants have not objected, the Court has considered possible hearsay problems associated with the newspaper articles. Plaintiff's out-of-court statements are admissible because they are either admissions of a party opponent or are not offered for the truth of the matter asserted (*i.e.*, not offered to prove that the Nelsons were making twenty pairs of skis per week, but rather to show state of mind). The reporters' repetition of those statements, however, are out-of-court declarations by a non-party offered for the truth of the matter asserted. The Court finds that in the extraordinary circumstances presented here, the articles are admissible under Fed. R. Ev. 807. First, the inventor's intent and actions during the 1992-93 season are material. Second, the recorded recollections, offered by plaintiff to the Patent and Trademark Office and this Court, are the best evidence available of what was said and done fifteen years ago. And finally, the general purposes of the hearsay rules and the interests of justice are best served by admission of these remarkably similar news reports regarding a critical, and distant, time period. See, e.g., Larez v. City of Los Angeles, 946 F.2d 630, 643-44 (9th Cir. 1991).

of some sort to give people a chance to try the wide short ski. None of the notes suggests that plaintiff intended to retain control of the skis after sale or that the shops or end-users would be required to do any tests or experiments with the skis.

The Sportsman transaction does not vary from this pattern. Ms. Nelson offered the MAX F/X with no strings attached. There is no indication that the skis were being offered for testing purposes or that there were any requirements or limits on how the skis could be used after purchase. The terms of the consignment did not require Sportsman or the ultimate consumer to conduct any particular test with or experiment on the skis, to keep records of any testing, to maintain the confidentiality of the invention, or to submit a report to plaintiff. Plaintiff retained no control over the invention except a right of return if payment were not made. The skis were apparently sold by Sportsman to an individual unknown to plaintiff and with whom he had no contact. The Smith transaction is even more bare-bones, with few terms other than price and shipping information specified between the parties. In both transactions, the skis were conveyed to apparent strangers, there was no provision for plaintiff's subsequent involvement in the assessment of the product, and plaintiff retained no supervision or control over the skis after they left his shop: it cannot reasonably be asserted that plaintiff's use of the invention during this time period was "experimental." See Lough, 86 F.3d at 1121.

Plaintiff relies heavily on the fact that every recipient of the MAX F/X ski received a questionnaire and was asked to provide information regarding the performance of the invention. Decl. of Coni Nelson at ¶ 5. Plaintiff argues that because skis are best tested in real world conditions by a number of skiers, public use coupled with a questionnaire was a necessary step in developing the invention. Although user testing would undoubtedly be helpful in the development of a ski, that fact does not tell us whether the 1992-93 sales were commercial or experimental in nature. Plaintiff had filed a patent application regarding a wide short ski as early as 1991, and the record shows activity during that time frame that could support a finding of

"experimentation." See Decl. of Paul Nelson, Ex. A (1991 confidentiality agreements with Research Dynamics and Salomon N. America for the review of the invention). The issue before the Court is whether the "primary purpose of the inventor <u>at the time of sale</u>, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." <u>Allen Eng'g</u>, 299 F.3d at 1354 (quoting <u>EZ Dock</u>, 276 F.3 at 1356-57 (emphasis added)).

Given the total lack of control retained by plaintiff and the balance of the remaining <u>EZ Dock</u> factors (276 F.3d at 1357), it is clear that the 1992-93 season sales were commercial in nature despite the dissemination of the questionnaire. Manufacturers often include user surveys with products that are unquestionably "sold:" requests for feedback do not, without more, suggest "experimentation." The fact that plaintiff had an interest in improving his product and requested input from his customers regarding their likes and dislikes did not make those customers "testers" and did not change the market sales reflected in the record (including those to Sportsman and Mr. Smith) into experiments.[5] The purchasers were under no obligation to complete the survey or communicate with plaintiff in any way: it appears that two-thirds of the purchasers declined to provide any feedback at all. The 1992-93 sales and evaluations were not part of an effort to ensure that the invention would serve its intended purpose: plaintiff was already marketing the MAX F/X as broadly as possible, with no requirements or limitations imposed on the users. Plaintiff made no effort to maintain control or secrecy over the invention after transferring the skis to shops like Sportsman and people like Mr. Smith. Skis were sold at market rates, no testing regimen was developed, and no experiments were performed. In these circumstances, typical commercial sales activities, such as the inclusion of consumer surveys with the product, are insufficient to establish an experimental relationship.

---

[5] It is undisputed that plaintiff made modifications to the MAX F/X ski following the 1992-93 ski season. There is no evidence, however, that these changes were a response to consumer comments contained in the surveys or were otherwise prompted by the "experimentation" allegedly performed during 1992-93.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT            -7-

1         Defendants have shown by clear and convincing evidence that at least one sale made prior to September 23, 1993, was a commercial sale and not primarily for the purpose of experimentation. The first prong of the Pfaff test is satisfied.

**B. Ready for Patenting**

        An invention is reduced to practice if the inventor has constructed an embodiment that meets all of the limitations of the claim and has determined that the invention works for its intended purpose. Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998). Plaintiff asserts that he "did not have a definite and permanent idea of the complete scope of my invention until I began the development of my MAX F/X III ski in December of 1993." Decl. of Paul Nelson at ¶ 11. Nevertheless, it is clear that plaintiff manufactured at least forty pairs of skis that fell within the scope of the three claims of the '522 patent. By marketing and selling these skis to the public, plaintiff showed that he was confident that the skis would work for their intended purpose. The invention was ready for patenting during the 1992-93 season.

        For all of the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

Dated this 5th day of February, 2009.

*(signature)*
Robert S. Lasnik
United States District Judge